UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| MILES TORAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:19-cv-00066-JMS-DLP |
| | ) |
| WEXFORD HEALTH SOURCES INC., et al. | ) |
| | ) |
| Defendants. | ) |

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Miles Toran injured his ankle at Wabash Valley Correctional Facility (WVCF) in 2018. In this lawsuit, Mr. Toran alleges that the defendants—Wexford Health Sources, Inc., and five medical professionals Wexford employed to care for Mr. Toran—have been deliberately indifferent to his injury and violated his Eighth Amendment rights.

The defendants have moved for summary judgment. While the evidence calls for judgment as a matter of law on some claims, others must be resolved at trial.

**I. Summary Judgment Standard**

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those that might affect the outcome of the suit under applicable substantive law." *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015) (internal quotation omitted). "A genuine dispute over a material fact exists if 'the evidence is such that a reasonable jury could return a verdict' for the nonmovant." *Machicote v. Roethlisberger*, 969 F.3d 822, 827 (7th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). The Court views the

1

facts in the light most favorable to the non-moving party and draws all reasonable inferences in the non-movant's favor. *See Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 628 (7th Cir. 2018).

## II. Facts

Mr. Toran injured his ankle playing basketball on August 15, 2018. Dkt. 62 at ¶ 14. He felt or heard a "pop" in his ankle when he injured it. Dkt. 58-6 at 9.

Mr. Toran visited Nurse Cynthia York in the infirmary that day. Dkt. 58-7 at 58–61. Nurse York observed that his ankle was swollen and described his condition to Dr. Samuel Byrd, who is a defendant in this action. *Id.* Nurse York gave Mr. Toran ice and a pair of crutches and wrapped the ankle in an elastic bandage. *Id.* At Dr. Byrd's direction, she instructed Mr. Toran to avoid putting weight on the ankle and to return for an x-ray if his condition did not improve. *Id.*

On August 16, 2018, Dr. Byrd ordered x-rays of the ankle. *Id.* at 57. On August 17, Nurse Chelsey Pearison placed Mr. Toran's ankle in a splint. *Id.* at 55–56. X-rays came back on August 20 and showed swelling in the soft tissues around the lateral malleolus, which is a bone on the outside of the ankle. *Id.* at 62.

Mr. Toran visited Dr. Byrd again on August 30, 2018. *Id.* at 52–54. He described "throbbing" pain with standing, walking, using stairs, and "essentially all activities." *Id.* at 52. Dr. Byrd gave Mr. Toran ankle braces, Naproxen, and exercises to perform on his own. *Id.* He also replaced Mr. Toran's crutches with a cane. *Id.*

Mr. Toran visited Nurse Ashton Yoakum at sick call on September 30, 2018. *Id.* at 42–44. Mr. Toran described a constant ache, shooting pains, and continued swelling. *Id.* Because Mr. Toran's condition had not improved in the month since his last visit with Dr. Byrd, Nurse Yoakum contacted Dr. Byrd. *Id.* In an e-mail, Nurse Yoakum noted that Mr. Toran's ankle remained "extremely swollen" for being six weeks past his injury and expressed concern that

Mr. Toran may have torn ligaments. Dkt. 63-2 at 35. Dr. Byrd responded within 30 minutes and characterized Mr. Toran's injury as a "bad high ankle sprain for sure." *Id.* He ordered another round of Naproxen. *Id.*

Dr. Byrd examined Mr. Toran again on October 4, 2018—about 50 days after Mr. Toran first hurt his ankle. Dkt. 58-7 at 38–41. Dr. Byrd observed that Mr. Toran's symptoms had not improved. *Id.* Indeed, he noted that the injury significantly limited Mr. Toran's range of motion and caused joint effusion, or retention of fluid around the joint. *Id.*

Dr. Byrd reiterated his impression that Mr. Toran had suffered a high ankle sprain. *Id.* He prescribed another round of Naproxen despite acknowledging it had not been effective, and he ordered another round of x-rays. *Id.* Dr. Byrd researched Mr. Toran's injury and determined that it warranted referral for treatment by a specialist—either a podiatrist or an orthopedist. Dkt. 63-2 at 45.

 X-ray results came back on October 9, 2018. Dkt. 58-7 at 69. A radiologist noted a linear osseous (or bony) density on the medial malleolus, which is the boney protrusion on the inner side of the ankle. *Id.* Based on the x-ray, Dr. Byrd believed Mr. Toran was suffering from a high ankle sprain or an evulsion fracture (a small chip) in his ankle bone. Dkt. 58-1 at ¶ 12.

On October 12, Dr. Byrd had a "collegial discussion" with Dr. Michael Mitcheff. *Id.* at ¶ 14. Dr. Mitcheff, who is a defendant in this action, was Wexford's Regional Medical Director. Dkt. 58-2 at ¶ 2.

Dr. Byrd asked for a collegial discussion to determine whether referral to a specialist was necessary. Dkt. 58-1 at ¶ 13. The record reflects a dispute regarding the necessity of a referral at this point. Dr. Byrd states in an affidavit that "[s]tandard treatment for a chip fracture would involve rest and allow time for the area to heal." *Id.* at ¶ 12. However, he also acknowledges that

3

a "chip fracture will not go away on its own." Dkt. 63-2 at 24. And he acknowledges that standard treatment for a high ankle sprain includes referral to a specialist. Dkt. 58-7 at 34; dkt. 63-2 at 45.

Mr. Toran has produced passages from several medical texts on treatment of high ankle sprains and fractures. The defendants do not address any of these texts in their reply or challenge the treatments recommended in them. According to one text, "treatment for a high ankle sprain should be conservative with a cast or walking boot for 4-6 weeks. Thereafter, protected weight bearing with crutches is recommended until the patient can walk pain-free." Dkt. 63-4 at 75. "Severe or prolonged persistent cases that do not heal may require" surgery. *Id.* A different text states that bone chips like Mr. Toran's are repaired surgically:

> Avulsion fractures of either malleolus are typically managed with tension bands or screws; however, a plate with screws may also be used. Tension band fixation may be preferred for smaller avulsed fragments.

*Id.* at 83 (footnotes omitted).

According to Wexford procedure, a physician must complete a collegial discussion with an appropriate superior before he can refer an inmate for treatment by a specialist outside the prison. Dkt. 63-6 at 39. The purpose of a collegial discussion is "to ensure the most appropriate care, at the right time, in the most cost-effective setting." *Id.*

The collegial discussion between Drs. Byrd and Mitcheff is not documented in Mr. Toran's medical records. The only evidence of the doctors' discussion is the affidavit testimony they have provided for this case. Dr. Mitcheff states that he questioned how effectively a specialist could examine Mr. Toran's ankle, given his extensive swelling. Dkt. 58-2 at ¶ 4. Based on this concern, he suggested that Mr. Toran be admitted to the WVCF infirmary to rest, elevate his ankle, and perform exercises under supervision. *Id.* at ¶ 5. Dr. Mitcheff states that he proposed this treatment to allow Mr. Toran's swelling to decrease and better determine the need for and likely effectiveness of referral to a specialist. *Id.* at ¶¶ 4–6.

Dr. Byrd accepted Dr. Mitcheff's recommendation. Dkt. 58-1 at ¶ 14. On October 12, 2018, Nurse Anne Conner, who is a defendant in this action, met with Mr. Toran to relay the physicians' proposal that he move to the infirmary for rest and supervised exercise. Dkt. 58-7 at 27–28. Mr. Toran refused to accept this treatment plan. *Id.* He believed that, if he moved to the infirmary for 30 days, he would lose his lucrative job in the prison's wire shop. Dkt. 62 at ¶¶ 27–28.

On October 16, 2018, Mr. Toran sent an informal grievance to Health Services Administrator Kim Hobson, who is a defendant in this action. Dkt. 58-8 at 50. Mr. Toran explained the course of his ankle injury to date and requested to be examined by a specialist. *Id.* Director of Nursing Amy Wright, who is also a defendant, responded on October 19. *Id.* at 51. She stated that Mr. Toran had refused the treatment plan offered to him and that he would have to submit a healthcare request form in order to further discuss his treatment. *Id.*

On October 26, 2018, Mr. Toran submitted a formal grievance. *Id.* at 53. He again noted the course of his injury, stated that rest and exercises had not led to recovery, and asked to be examined by a specialist. *Id.* Ms. Hobson responded on November 1, stating simply that Mr. Toran had refused the treatment he was offered and that he would not be considered for referral to a specialist until he spent 30 days in the infirmary. *Id.* at 57. Mr. Toran appealed Ms. Hobson's response and was denied. *Id.* at 64–66.

The medical staff confiscated Mr. Toran's cane on November 28, 2018. Dkt. 62 at ¶ 37. On January 6, 2019, he requested to have pain relievers refilled. Dkt. 63-3 at 8. On January 9, he requested to be re-evaluated by Dr. Byrd and to have an MRI taken. *Id.* at 10, 12. Dr. Byrd ordered new x-rays. Dkt. 58-7 at 5.

Dr. Byrd met with Mr. Toran on February 14, 2019, to discuss his new x-rays. *Id.* at 1–4. Dr. Byrd described Mr. Toran's symptoms and x-rays as "essentially unchanged since October."

5

*Id.* at 1. He noted that Mr. Toran could not perform any kind of recreation and was gaining weight and that his range of motion had decreased. *Id.* Dr. Byrd continued to believe Mr. Toran was afflicted with a chip fracture and a high ankle sprain. *Id.* at 3. He directed that Mr. Toran receive a new ankle brace and prescribed prednisone to decrease swelling. *Id.* According to Mr. Toran, Dr. Byrd stated during this visit that he would again request referral to a specialist. Dkt. 62 at ¶ 47.

On April 12, 2019, Mr. Toran saw Nurse Chantell Knepp at sick call. Dkt. 63-3 at 34–35. He reported that he continued to experience the same symptoms from his ankle injury. *Id.* According to Nurse Knepp, Mr. Toran became angry and left when she stated that he had refused treatment for the injury by refusing infirmary admission. *Id.* at 35. According to Mr. Toran, Nurse Knepp reported that Dr. Byrd said he decided not to place a second referral request because it would be denied. Dkt. 62 at ¶ 50.

Mr. Toran saw Dr. Byrd again on August 15, 2019. Dkt. 63-3 at 43–45. Dr. Byrd's treatment note describes Mr. Toran's condition as essentially unchanged since their last visit six months earlier. *Id.* However, Dr. Byrd changed his "assessment" of Mr. Toran's condition from having a high ankle sprain with a chip fracture to "ankle pain." *Id.* at 45. This change is not explained anywhere in the record. Dr. Byrd refused Mr. Toran's request for an MRI and instead proposed physical therapy. *Id.* Mr. Toran refused that proposal when Dr. Byrd clarified that, to receive regular physical therapy, he would have to transfer to a different prison with an in-house physical therapist. *Id.* Dr. Byrd did not provide or prescribe any medication or assistive devices at the August 15 visit. *Id.* at 45.

Dr. Mitcheff states in his affidavit that his decision to approve an infirmary stay instead of referral to a specialist was based on his medical judgment and not any Wexford policy or interest in saving money. Dkt. 58-2 at ¶ 6. Dr. Mitcheff states "it would be easier on the facility" to refer

6

Mr. Toran to a specialist than to dedicate an infirmary bed to him for 30 days. *Id.* He does not dispute, however, that referring Mr. Toran to a specialist would have been more expensive.

Mr. Toran has produced a Wexford Technical Proposal. Dkt. 63-4 at 89–100; dkt. 63-5; dkt. 63-6; dkt. 63-7; dkt. 63-8. The defendants produced this document in response to a discovery request, although it is not clear when or for what purpose it was created. It includes statements of several Wexford policies or practices, such as the requirement of a collegial review before referring an inmate for examination by a specialist. *See* dkt. 63-6 at 39–40. Several passages from the Technical Proposal state the importance of limiting expenses and inmate transportation outside their prisons for medical care. For example:

- "As set forth herein, the IDOC highly recommends (expects) the Vendor deliver a significant portion of medical services that require consultation with a specialist physician by 'tele-health' or tele-medicine' method, or through onsite specialty clinics or mobile services. The highest priority of specialty services should be given to reducing off site transportation." *Id.* at 30.

- "Wexford's goal is to help the IDOC to avoid offender transport and offsite security costs." *Id.* at 35.

- "***Wexford will make every effort to minimize offsite clinic trips.***" *Id.* (emphasis in original).

- Collegial reviews serve "to ensure the ***most appropriate*** care, at the ***right time***, in the ***most cost-effective*** setting." *Id.* at 39 (emphasis in original).

### III. Analysis

Viewed in the light most favorable to Mr. Toran, the evidence discussed above would allow a reasonable jury to return verdicts in his favor against Dr. Byrd, Dr. Mitcheff, and Wexford. Meanwhile, the parties dispute only what legal standard applies to Mr. Toran's claims against Nurse Conner, Ms. Hobson, and Nurse Wright, and the prevailing standard entitles them to judgment as a matter of law.

A.     Drs. Byrd and Mitcheff

"To determine if the Eighth Amendment has been violated in the prison medical context," the Court must "perform a two-step analysis, first examining whether" Mr. Toran "suffered from an objectively serious medical condition, and then determining whether" his medical care providers were "deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

The first step is simple in this case. The Seventh Circuit's "cases demonstrate that a broad range of medical conditions"—including broken bones—"may be sufficient to meet the objective prong of a deliberate indifference claim." *Roe v. Elyea*, 631 F.3d 843, 861 (7th Cir. 2011). Mr. Toran has a high ankle sprain, an avulsion fracture, or both. His injury has caused him pain and limited mobility for over two years. His ankle injury is objectively serious for Eighth Amendment purposes, and the defendants do not argue otherwise.

The second step is more complicated and reveals a material factual dispute. "A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if 'the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008) (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998)). "By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment." *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016).

However, every decision made by a medical professional does not necessarily reflect medical judgment. A physician's treatment decision may be deliberately indifferent if it is "so far

8

afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). If "no minimally competent professional would have [recommended the same] under those circumstances," the treatment decision may be deliberately indifferent. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "The cost of treatment alternatives is a factor in determining what constitutes adequate, minimum-level medical care, . . . but medical personnel cannot simply resort to an easier course of treatment that they know is ineffective." *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) (citing *Ralston v. McGovern,* 167 F.3d 1160, 1162 (7th Cir.1999) and *Kelley v. McGinnis,* 899 F.2d 612, 616 (7th Cir.1990)).

Mr. Toran has presented evidence of standard treatment for high ankle sprains and avulsion fractures of the ankle.[1] According to this evidence, once Dr. Byrd diagnosed a high ankle sprain, he should have placed Mr. Toran's ankle in a cast or walking boot for at least four weeks. Dkt. 63-4 at 75. Meanwhile, standard treatment for a chip fracture is surgery. *Id.* at 83. Indeed, the defendants have presented evidence that Dr. Byrd knew standard care for a high ankle sprain required referral to a specialist. Dkt. 63-2 at 45.

Dr. Byrd and Dr. Mitcheff did not provide care consistent with this standard. Mr. Toran injured his ankle on August 15, 2018. Dkt. 62 at ¶ 14. Based on his symptoms and lack of progress, Dr. Byrd believed "for sure" that Mr. Toran had a high ankle sprain on September 30. Dkt. 63-2 at 35. When Dr. Byrd examined Mr. Toran on October 4, he did not place Mr. Toran's ankle in a walking boot or cast or refer him to a specialist, even though his research told him that was the

---

[1] For purposes of summary judgment, the Court accepts the passages Mr. Toran has presented from medical texts as statements from a learned treatise that may be admitted under Federal Rule of Evidence 803(18). Mr. Toran has not presented this evidence through an expert witness, but he has "point[ed] to evidence that can be put in an admissible form at trial." *Marr v. Bank of America*, 662 F.3d 963, 966 (7th Cir. 2011). Moreover, the defendants have not challenged the admissibility of these passages.

9

standard of care. Dkt. 58-7 at 38–41; dkt. 63-2 at 45. On October 9, Dr. Byrd identified what he believed was a chip fracture. Dkt. 58-1 at ¶ 12. At this point, he proposed referral to a specialist, but he and Dr. Mitcheff settled on a more conservative approach that appears to have fallen below the standard of care.

After Mr. Toran refused infirmary admission, his care continued to fall bellow the apparent standard. his care fell further below the standard. On November 28, 2018, the medical staff confiscated his cane, leaving him to bear weight on the ankle. Dkt. 62 at ¶ 37. When Dr. Byrd met with Mr. Toran on February 14, 2019, his assessment of the injury had not changed, but he still did not place Mr. Toran's ankle in a cast or walking boot, provide him with an assistive device, or reinitiate referral to a specialist. Dkt. 58-7 at 1–4. And on August 15, Dr. Byrd described Mr. Toran's condition as unchanged but downgraded his diagnosis to "ankle pain" without explanation and proposed physical therapy instead of standard treatment for the injuries he diagnosed nearly a year earlier. Dkt. 63-3 at 43–45.

Of course, Dr. Byrd has testified that standard treatment for Mr. Toran's injuries involved rest. Dkt. 58-1 at ¶ 12. If a jury accepted that testimony, it could find that Dr. Byrd and Dr. Mitcheff offered Mr. Toran treatment that fulfilled their Eighth Amendment obligations. But if a jury accepted the evidence Mr. Toran has presented, it could reasonably find that they provided treatment so far below the industry standard that it did not reflect medical judgment from a minimally competent professional. *See Norfleet*, 439 at 396; *Pyles*, 771 F.3d at 409.

In reaching this decision, the Court does not ignore Mr. Toran's refusal of two different treatment plans. "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles*, 771 F.3d at 409. More to the point, "an inmate is not

10

entitled to demand specific care and is not entitled to the best care possible . . . ." *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011).

At the same time, an Eighth Amendment claim does not fail for the mere fact that the plaintiff received "*some* treatment." *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005). Rather, courts must consider "the possibility that the treatment [the plaintiff] did receive was 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." *Id.* (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)). The evidence here allows such a finding. A jury could reasonably find that no minimally competent professional would endorse the care Dr. Byrd provided before his meeting with Dr. Mitcheff, their decision to forego referral to a specialist, and the course of treatment Dr. Byrd provided after that decision. Mr. Toran may present these claims to a jury.

**B.     Wexford**

Although a private entity, Wexford acts under color of state law and therefore may be liable for violating Mr. Toran's Eighth Amendment rights only under the theory announced in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). *Walker v. Wexford Health Sources*, 940 F.3d 954, 966 (7th Cir. 2019). "Prevailing on such a claim requires evidence that a Wexford policy, practice, or custom caused" the constitutional violation discussed above. *Id.* "It does not matter if the policy was duly enacted or written down, nor does it matter if the policy counsels aggressive intervention into a particular matter or a hands-off approach." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017).

Mr. Toran has presented evidence from which a jury could find that Wexford policies or practices caused Dr. Byrd and Dr. Mitcheff to treat him with deliberate indifference. Dr. Byrd diagnosed Mr. Toran with a high ankle sprain and chip fracture, and the record indicates that he

11

knew standard treatment for those injuries required referral to a specialist. Wexford policy or practice required him to gain Dr. Mitcheff's approval after a collegial discussion. According to the record, the purpose of a collegial discussion is "to ensure the *most appropriate* care, at the *right time*, in the *most cost-effective* setting." Dkt. 63-6 at 39 (emphasis in original). The record also reflects that the Indiana Department of Correction directed Wexford to make "reducing off site transportation and security costs" its "highest priority" in determining whether and how to provide specialized medical care to inmates. *Id.* at 30. In response to that direction, "Wexford's goal is to help the IDOC to avoid offender transport and offsite security costs." *Id.* at 35.

A jury could accept the defendants' testimony that they developed Mr. Toran's treatment plan based strictly on good-faith medical judgments. However, a jury could also infer from the evidence discussed above that Dr. Byrd and Dr. Mitcheff knowingly deviated from the standard of care for Mr. Toran's injuries and that they did so for reasons unrelated to medical judgment. The evidence leaves material facts in dispute and precludes judgment as a matter of law for Wexford.

**C.     Nurse Conner, Ms. Hobson, and Nurse Wright**

Mr. Toran's claims against Nurse Conner, Ms. Hobson, and Nurse Wright are markedly different from his claims against the physicians who treated him. No evidence suggests—and Mr. Toran does not allege—that these defendants were involved in designing or approving a course of treatment for his ankle injury. Nurse Conner's sole involvement in the case was communicating the physicians' proposal that Mr. Toran move to the infirmary for rest and supervised exercise. Dkt. 58-7 at 27–28. Nurse Wright's only involvement was responding to Mr. Toran's informal grievance and stating he would have to submit a healthcare request to further discuss his treatment. Dkt. 58-8 at 51. Ms. Hobson's only involvement was responding to Mr. Toran's formal grievance

and stating he would not be considered for referral to a specialist until he spent 30 days in the infirmary according to the doctors' plan. *Id.* at 57.

"Liability under [42 U.S.C.] § 1983 is direct rather than vicarious. " *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018). "Only someone personally responsible in a constitutional violation can be held liable under [42 U.S.C.] § 1983." *Wojcik v. Cook Cnty.*, 803 F. App'x 25, 27 (7th Cir. 2020) (citing *Wilson v. Warren Cnty., Ill.*, 830 F.3d 464, 469 (7th Cir. 2016)).

More specifically, it is well-settled that denying an inmate's grievance or refusing to investigate an incident after the fact does not, by itself, amount to a constitutional violation. *E.g.*, *George v. Smith*, 507 F.3d 605, 609–10 (7th Cir. 2007) ("Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation. A guard who stands and watches while another guard beats a prisoner violates the Constitution; a guard who rejects an administrative complaint about a completed act of misconduct does not."). "Officers responding to grievances do not act deliberately indifferent by 'car[rying] out [their] job exactly as [they were] supposed to.'" *Hill v. Nicholson*, 829 F. App'x 141, 143 (7th Cir. 2020) (quoting *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009)).

Mr. Toran correctly notes that, "[a]lthough a medical care system requires nurses to defer to treating physicians' instructions and orders in most situations, that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient." *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010). The facts of this case are different from those in *Berry*, though.

After a jail doctor denied Mr. Berry's requests to see a dentist, he complained of severe, worsening tooth pain to a nurse several times over the next six weeks. *Id.* The nurse responded to those complaints by stating that Berry could not see a dentist. *Id.* The Seventh Circuit reasoned

13

that, "[g]iven the substantial passage of time" and "Nurse Reich's continued responses to Berry's complaints during that time, a jury could conclude that Reich acted independently rather than on Dr. Butler's instructions," that Reich "was therefore personally responsible for delaying Berry's dental treatment," and "that the imposition of this delay constituted deliberate indifference to Berry's serious pain." *Id.* And, "[t]o the extent that Nurse Reich did in fact consult with Dr. Butler, . . . a jury could question whether he could justifiably defer to Dr. Butler's opinions." *Id.* Nurse Reich knew Dr. Butler had no specialized training in dentistry, and Dr. Butler's refusal to refer Berry to a dentist was "obdurate" enough to be characterized as "gratuitous cruelty." *Id.* at 441–43.

The collegial review between Drs. Byrd and Mitcheff occurred on October 12, 2018. Dkt. 58-1 at ¶ 14. Nurse Conner met with Mr. Toran that day. Dkt. 58-7 at 27–28. Mr. Toran submitted his informal grievance on October 16 and his formal grievance on October 26. Dkt. 58-8 at 50, 53. The record does not indicate they should have suspected that Mr. Toran's condition had changed significantly since his last interaction with Dr. Byrd on October 4. Moreover, the Seventh Circuit reasoned that Nurse Reich should have doubted Dr. Butler's refusal to refer Berry to a dentist "[a]s a matter of simple common sense." *Berry*, 604 F.3d at 443. It may be true that no minimally competent physician would have refused to refer Mr. Toran to a specialist. But the record does not indicate that the need for specialized treatment was so obvious that any non-physician should have recognized that refusing to refer Mr. Toran would seriously endanger him. This is particularly true given that Mr. Toran's case had just received significant attention from two physicians.

On the facts of this case, Nurses Conner, Hobson, and Wright did not act with deliberate indifference by deferring to the instructions of Mr. Toran's treating physician and his supervisor.

*Id.* No evidence suggests that they were personally responsible for Mr. Toran's receipt of inadequate medical care. *Wojcik*, 803 F. App'x at 27. They are entitled to judgment as a matter of law.

### IV. Conclusion

The defendants' motion for summary judgment, dkt. [56], is **granted in part and denied in part**. The motion is **granted** as to defendants Conner, Hobson, and Wright. Claims against these defendants are **dismissed with prejudice**, and the **clerk is directed** to **terminate** them as parties on the docket. No partial final judgment shall issue at this time. The motion is **denied** as to all other defendants.

Mr. Toran's claims against Dr. Byrd, Dr. Mitcheff, and Wexford will be resolved by settlement or trial. The Court *sua sponte* **reconsiders** and **grants** Mr. Toran's motion for assistance with recruiting counsel, dkt. [24]. The Court will attempt to recruit counsel to assist Mr. Toran through the conclusion of the action. The Court requests that Magistrate Judge Pryor hold a telephonic status conference after recruited counsel has appeared.

**IT IS SO ORDERED.**

Date: 2/4/2021

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

MILES TORAN
231496
WABASH VALLEY – CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
6908 S. Old US Hwy 41
P.O. Box 1111
CARLISLE, IN 47838

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Magistrate Judge Doris Pryor